# NATIONAL LABOR RELATIONS BOARD v. BILDISCO & BILDISCO, DEBTOR-IN-POSSESSION, ET AL.

No. 82–818.   Argued October 11, 1983—Decided February 22, 1984*

---

*Together with No. 82–852, *Local 408, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America* v. *National Labor Relations Board et al.*, also on certiorari to the same court.

514

REHNQUIST, J., delivered the opinion of the Court, in Parts I and II of which all other Members joined, and in Part III of which BURGER, C. J., and POWELL, STEVENS, and O'CONNOR, JJ., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which WHITE, MARSHALL, and BLACKMUN, JJ., joined, *post*, p. 535.

*Deputy Solicitor General Wallace* argued the cause for the National Labor Relations Board. With him on the briefs were *Solicitor General Lee, Carolyn F. Corwin, Norton J. Come, Linda Sher,* and *James Y. Callear.*

*James R. Zazzali* argued the cause for petitioner in No. 82–852. With him on the brief was *Kenneth I. Nowak.*

*Jack M. Zachin* argued the cause and filed a brief for respondents in No. 82–818.†

JUSTICE REHNQUIST delivered the opinion of the Court.

Two important and related questions are presented by these petitions for certiorari: (1) under what conditions can a Bankruptcy Court permit a debtor-in-possession to reject a collective-bargaining agreement; (2) may the National Labor Relations Board find a debtor-in-possession guilty of an unfair labor practice for unilaterally terminating or modifying a collective-bargaining agreement before rejection of that agreement has been approved by the Bankruptcy Court. We decide that the language "executory contract" in § 365(a) of the Bankruptcy Code, 11 U. S. C. § 365(a) (1982 ed.), includes within it collective-bargaining agreements subject to the National Labor Relations Act, and that the Bankruptcy Court may approve rejection of such contracts by the debtor-in-possession upon an appropriate showing. We also decide that a debtor-in-possession does not commit an unfair labor practice when, after the filing of a bankruptcy petition but before court-approved rejection of the collective-bargaining

---

†Briefs of *amicus curiae* urging reversal were filed for the American Federation of Labor and Congress of Industrial Organizations by *J. Albert Woll, Laurence Gold,* and *Claude Montgomery;* and for the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America by *David Previant* and *Robert M. Baptiste.*

*John S. Irving, Carl L. Taylor,* and *Stephen A. Bokat* filed a brief for the Chamber of Commerce of the United States as *amicus curiae* urging affirmance.

*Michael H. Holland* and *James C. Kuhn III* filed a brief for the United Mine Workers of America, International Union, as *amicus curiae.*

agreement, it unilaterally modifies or terminates one or more provisions of the agreement. We therefore affirm the judgment of the Court of Appeals for the Third Circuit in these cases.

I

A

On April 14, 1980, respondent Bildisco and Bildisco (Bildisco), a New Jersey general partnership in the business of distributing building supplies, filed a voluntary petition in bankruptcy for reorganization under Chapter 11 of the Bankruptcy Code, 11 U. S. C. § 1101 *et seq.* (1982 ed.).[1] Bildisco was subsequently authorized by the Bankruptcy Court to operate the business as debtor-in-possession under 11 U. S. C. § 1107 (1982 ed.).[2]

At the time of the filing of the petition in bankruptcy, approximately 40 to 45 percent of Bildisco's labor force was represented by Local 408 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of Amer-

---

[1] Chapter 11 of the present Bankruptcy Code was part of the Bankruptcy Reform Act of 1978, Pub. L. 95–598, 92 Stat. 2549. The first major revision of the bankruptcy laws since 1938, the Bankruptcy Reform Act consolidated three reorganization chapters of the former Bankruptcy Act into a single business reorganization chapter, with the intention that business reorganizations should be quicker and more efficient and provide greater protection to the debtor, creditors, and the public interest. See H. R. Rep. No. 95–595, p. 5 (1977).

[2] Title 11 U. S. C. § 1107 (1982 ed.) provides:

"(a) Subject to any limitations on a trustee under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter."

Although the term "debtor-in-possession" is not fully interchangeable with the term "trustee in bankruptcy" under the Bankruptcy Code, with respect to the issues before us the analysis is the same whether it is the debtor-in-possession or trustee in bankruptcy who is attempting to reject a collective-bargaining agreement.

ica (Union). Bildisco had negotiated a 3-year collective-bargaining agreement with the Union that was to expire on April 30, 1982, and which expressly provided that it was binding on the parties and their successors even though bankruptcy should supervene. Beginning in January 1980, Bildisco failed to meet some of its obligations under the collective-bargaining agreement, including the payment of health and pension benefits and the remittance to the Union of dues collected under the agreement. In May 1980, Bildisco refused to pay wage increases called for in the collective-bargaining agreement.

In December 1980, Bildisco requested permission from the Bankruptcy Court, pursuant to 11 U. S. C. § 365(a) (1982 ed.),[3] to reject the collective-bargaining agreement. At the hearing on Bildisco's request the sole witness was one of Bildisco's general partners, who testified that rejection would save his company approximately $100,000 in 1981. The Union offered no witnesses of its own, but cross-examined the witness for Bildisco. On January 15, 1981, the Bankruptcy Court granted Bildisco permission to reject the collective-bargaining agreement and allowed the Union 30 days in which to file a claim for damages against Bildisco stemming from the rejection of the contract. The District Court upheld the order of the Bankruptcy Court, and the Union appealed to the Court of Appeals for the Third Circuit.

## B

During midsummer 1980, the Union filed unfair labor practice charges with the National Labor Relations Board (Board). The General Counsel of the Board issued a complaint alleging that Bildisco had violated § 8(a)(5) and § 8(a)(1) of the National Labor Relations Act (NLRA), 29 U. S. C.

---

[3] Title 11 U. S. C. § 365(a) (1982 ed.) reads:

"(a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

§ 158(a)(5) and § 158(a)(1),[4] by unilaterally changing the terms of the collective-bargaining agreement, in failing to pay certain contractually mandated fringe benefits and wage increases and to remit dues to the Union. Ultimately the Board found that Bildisco had violated § 8(a)(5) and § 8(a)(1) of the NLRA by unilaterally changing the terms of the collective-bargaining agreement and by refusing to negotiate with the Union. Bildisco was ordered to make the pension, health, and welfare contributions and to remit dues to the Union, all as required under the collective-bargaining agreement. The Board petitioned the Court of Appeals for the Third Circuit to enforce its order.

## C

The Court of Appeals consolidated the Union's appeal and the Board's petition for enforcement of its order. *In re Bildisco*, 682 F. 2d 72 (1982). That court held that a collective-bargaining agreement is an executory contract subject to rejection by a debtor-in-possession under § 365(a) of the Bankruptcy Code. The authority of the debtor-in-possession to seek rejection of the collective-bargaining agreement was not qualified by the restrictions of § 8(d) of the NLRA, which established detailed guidelines for mid-term modification of collective-bargaining agreements,[5] be-

---

[4] Section 8(a) of the NLRA, 61 Stat. 140, 29 U. S. C. § 158(a), provides in pertinent part:

"(a) Unfair labor practices by employer

"It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;

.        .        .        .        .

"(5) to refuse to bargain collectively with the representatives of his employees . . . ."

[5] Section 8(d) of the NLRA, 61 Stat. 142, 29 U. S. C. § 158(d), reads in relevant part:

"(d) Obligation to bargain collectively

"For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the

cause in the court's view, the debtor-in-possession was a "new entity" not bound by the labor agreement. The Court of Appeals concluded, however, that given the favored status Congress has accorded collective-bargaining agreements, a debtor-in-possession had to meet a more stringent test than the usual "business judgment" rule to obtain rejection. The Court of Appeals accepted the standard applied by the Court of Appeals for the Second Circuit in *Shopmen's Local Union No. 455* v. *Kevin Steel Products, Inc.,* 519 F. 2d 698, 707

---

employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: *Provided,* That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

"(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

"(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

"(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute . . .; and

"(4) continues in full force and effect, without resorting to strike or lockout, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later:

"The duties imposed upon employers, employees, and labor organizations by paragraphs (2) to (4) . . . shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract. . . ."

(1975), and required the debtor-in-possession to show not only that the collective-bargaining agreement is burdensome to the estate, but also that the equities balance in favor of rejection. The case was remanded for the Bankruptcy Court's reconsideration in light of the standards enunciated.

The Court of Appeals refused to enforce the Board's order, rejecting the Board's conclusion that Bildisco, as debtor-in-possession, was the alter ego of the prepetition employer. Under the Bankruptcy Code, a debtor-in-possession was deemed a "new entity" not bound by the debtor's prior collective-bargaining agreement. Because rejection relates back to the filing of a petition, the Court of Appeals held that if Bildisco were permitted to reject the contract, the Board was precluded from premising an unfair labor practice on Bildisco's rejection of the labor contract. The Court of Appeals implied that if the Bankruptcy Court determined that the collective-bargaining agreement should not be rejected, the Board could find a violation of § 8(d) of the NLRA.

We granted certiorari to review the decision of the Court of Appeals because of the apparent conflict between that decision and the decision of the Court of Appeals for the Second Circuit in *Brotherhood of Railway, Airline and Steamship Clerks* v. *REA Express, Inc.*, 523 F. 2d 164, cert. denied, 423 U. S. 1017 (1975).

## II

Section 365(a) of the Bankruptcy Code, 11 U. S. C. § 365(a) (1982 ed.), provides in full:

> "(a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

This language by its terms includes all executory contracts except those expressly exempted, and it is not disputed by the parties that an unexpired collective-bargaining

agreement is an executory contract.[6]   Any inference that collective-bargaining agreements are not included within the general scope of § 365(a) because they differ for some purposes from ordinary contracts, see *John Wiley & Sons, Inc. v. Livingston*, 376 U. S. 543, 550 (1964), is rebutted by the statutory design of § 365(a) and by the language of § 1167 of the Bankruptcy Code.   The text of § 365(a) indicates that Congress was concerned about the scope of the debtor-in-possession's power regarding certain types of executory contracts, and purposely drafted § 365(a) to limit the debtor-in-possession's power of rejection or assumption in those circumstances.[7]   Yet none of the express limitations on the debtor-in-possession's general power under § 365(a) apply to collective-bargaining agreements.   Section 1167, in turn, expressly exempts collective-bargaining agreements subject to the Railway Labor Act, but grants no similar exemption to agreements subject to the NLRA.[8]   Obviously, Congress

---

[6] The Bankruptcy Code furnishes no express definition of an executory contract, see 11 U. S. C. § 365(a) (1982 ed.), but the legislative history of § 365(a) indicates that Congress intended the term to mean a contract "on which performance remains due to some extent on both sides."   H. R. Rep. No. 95–595, p. 347 (1977); see S. Rep. No. 95–989, p. 58 (1978).   We reject the argument of *amicus* United Mine Workers of America that a collective-bargaining agreement is not an executory contract within the meaning of § 365(a).   Under their labor contract both Bildisco and the Union had reciprocal obligations, and at any point during the life of the contract, performance was due by both parties.   See Labor Contract between Bildisco and Teamsters Local No. 408, App. 78–115.

[7] Although Congress granted the debtor-in-possession a broad power to assume or reject executory contracts, it qualified that power in certain situations.   Very generally, subsections (b) and (c) limit the debtor-in-possession's or trustee's power of assumption in several circumstances; subsection (d) requires assumption or rejection within 60 days in cases of liquidation.   Bankruptcy Code § 765 and § 766 limit the power of rejection or assumption in the case of the liquidation of a commodity brokerage business.

[8] Title 11 U. S. C. § 1167(a) (1982 ed.) reads in full:
"Notwithstanding section 365 of this title, neither the court nor the trustee may change the wages or working conditions of employees of the

knew how to draft an exclusion for collective-bargaining agreements when it wanted to; its failure to do so in this instance indicates that Congress intended that § 365(a) apply to all collective-bargaining agreements covered by the NLRA.

None of the parties to these cases dispute the foregoing proposition. But the Board contends that the standard by which the Bankruptcy Court must judge the request of a debtor-in-possession to reject a collective-bargaining contract must be stricter than the traditional "business judgment" standard applied by the courts to authorize rejection of the ordinary executory contract. See *Group of Institutional Investors* v. *Chicago, M., St. P. & P. R. Co.*, 318 U. S. 523, 550 (1943); see also *In re Minges*, 602 F. 2d 38, 42 (CA2 1979); *In re Tilco, Inc.*, 558 F. 2d 1369, 1372 (CA10 1977). The Union also contends that the debtor-in-possession must comply with the procedural requirements of § 8(d) of the NLRA, or at a minimum, bargain to impasse before it may request the Bankruptcy Court either to assume or to reject the collective-bargaining agreement.

Although there is no indication in § 365 of the Bankruptcy Code that rejection of collective-bargaining agreements should be governed by a standard different from that governing other executory contracts, all of the Courts of Appeals which have considered the matter have concluded that the standard should be a stricter one. See *In re Brada Miller Freight System, Inc.*, 702 F. 2d 890 (CA11 1983); *In re Bildisco*, 682 F. 2d 72 (CA3 1982); see also *Local Joint Executive Board* v. *Hotel Circle, Inc.*, 613 F. 2d 210 (CA9 1980)

debtor established by a collective-bargaining agreement that is subject to the Railway Labor Act (45 U. S. C. 151 et seq.) except in accordance with section 6 of such Act (45 U. S. C. 156)."

This provision was derived from former § 77(n) of the Bankruptcy Act. Reflective of the longstanding special treatment afforded railway labor, see *Railway Employees* v. *Hanson*, 351 U. S. 225, 232, and n. 5 (1956), Congress determined that "the subject of railway labor is too delicate . . . for this code to upset established relationships." H. R. Rep. No. 95–595, p. 423 (1977).

(rejection under the Bankruptcy Act); *Shopmen's Local Union No. 455* v. *Kevin Steel Products, Inc.*, 519 F. 2d 698 (CA2 1975) (same). We agree with these Courts of Appeals that because of the special nature of a collective-bargaining contract, and the consequent "law of the shop" which it creates, see *John Wiley & Sons, supra; Steelworkers* v. *Warrior & Gulf Navigation Co.*, 363 U. S. 574, 578–579 (1960), a somewhat stricter standard should govern the decision of the Bankruptcy Court to allow rejection of a collective-bargaining agreement.

The Union and the Board argue that in light of the special nature of rights created by labor contracts, Bildisco should not be permitted to reject the collective-bargaining agreement unless it can demonstrate that its reorganization will fail unless rejection is permitted. This very strict standard was adopted by the Second Circuit in *Brotherhood of Railway, Airline and Steamship Clerks* v. *REA Express, Inc.*, 523 F. 2d, at 167–169, decided under the former Bankruptcy Act three years before § 365(a) was passed by Congress. Under the canon of statutory construction that Congress is presumed to be aware of judicial interpretations of a statute, the Board argues that Congress should be presumed to have adopted the interpretation of the Second Circuit when it enacted § 365(a). See *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U. S. 353, 379–382 (1982); *Lorillard* v. *Pons*, 434 U. S. 575, 580–581 (1978). The Board makes a related argument that Congress was fully aware of the strict standard for rejection established in *REA Express* and approved that standard when enacting § 365(a) of the Bankruptcy Code. In the legislative history accompanying § 82 of the Bankruptcy Act, a provision relating to municipal bankruptcies, the Report of the House Committee on the Judiciary referred to *Kevin Steel Products, supra,* and *REA Express, supra,* as authority for the proposition that a stricter showing than the "business judgment" test was necessary to reject a collective-bargaining agreement. See H. R. Rep.

No. 94–686, pp. 17–18 (1975). Since Congress made § 365(a) applicable to municipal bankruptcies, see 11 U. S. C. § 901(a) (1982 ed.), the Board argues that this reference to *REA Express* supports an inference that Congress adopted the *REA Express* standard for rejecting collective-bargaining agreements when it enacted § 365(a).

These arguments are wholly unconvincing. Quite simply, *Kevin Steel* and *REA Express* reflect two different formulations of a standard for rejecting collective-bargaining agreements. Congress cannot be presumed to have adopted one standard over the other without some affirmative indication of which it preferred. The reference in the House Report to *Kevin Steel* and *REA Express* also cannot be considered a congressional endorsement of the stricter standard imposed on rejection of collective-bargaining agreements by the Second Circuit in *REA Express*, since the Report indicates no preference for either formulation. At most, the House Report supports only an inference that Congress approved the use of a somewhat higher standard than the "business judgment" rule when appraising a request to reject a collective-bargaining agreement.

The standard adopted by the Court of Appeals for the Second Circuit in *REA Express* is fundamentally at odds with the policies of flexibility and equity built into Chapter 11 of the Bankruptcy Code. The rights of workers under collective-bargaining agreements are important, but the *REA Express* standard subordinates the multiple, competing considerations underlying a Chapter 11 reorganization to one issue: whether rejection of the collective-bargaining agreement is necessary to prevent the debtor from going into liquidation. The evidentiary burden necessary to meet this stringent standard may not be insurmountable, but it will present difficulties to the debtor-in-possession that will interfere with the reorganization process.

We agree with the Court of Appeals below, and with the Court of Appeals for the Eleventh Circuit in a related case,

*In re Brada Miller Freight System, Inc.*, *supra*, that the Bankruptcy Court should permit rejection of a collective-bargaining agreement under § 365(a) of the Bankruptcy Code if the debtor can show that the collective-bargaining agreement burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract. The standard which we think Congress intended is a higher one than that of the "business judgment" rule, but a lesser one than that embodied in the *REA Express* opinion of the Court of Appeals for the Second Circuit.

Before acting on a petition to modify or reject a collective-bargaining agreement, however, the Bankruptcy Court should be persuaded that reasonable efforts to negotiate a voluntary modification have been made and are not likely to produce a prompt and satisfactory solution. The NLRA requires no less. Not only is the debtor-in-possession under a duty to bargain with the union under § 8(a)(5) of the NLRA, 29 U. S. C. § 158(a)(5), see *infra*, at 534, but the national labor policies of avoiding labor strife and encouraging collective bargaining, § 1, NLRA, 29 U. S. C. § 151, generally require that employers and unions reach their own agreements on terms and conditions of employment free from governmental interference. See, *e. g.*, *Howard Johnson Co.* v. *Hotel Employees*, 417 U. S. 249 (1974); *NLRB* v. *Burns International Security Services, Inc.*, 406 U. S. 272, 282–294 (1972). The Bankruptcy Court need step into this process only if the parties' inability to reach an agreement threatens to impede the success of the debtor's reorganization. If the parties are unable to agree, a decision on the rejection of the collective-bargaining agreement may become necessary to the reorganization process. At such a point, action by the Bankruptcy Court is required, while the policies of the NLRA have been adequately served since reasonable efforts to reach agreement have been made. That court need not determine that the parties have bargained to impasse or make any other

determination outside the field of its expertise. See *infra*, at 533–534.

Since the policy of Chapter 11 is to permit successful rehabilitation of debtors, rejection should not be permitted without a finding that that policy would be served by such action. The Bankruptcy Court must make a reasoned finding on the record why it has determined that rejection should be permitted. Determining what would constitute a successful rehabilitation involves balancing the interests of the affected parties—the debtor, creditors, and employees. The Bankruptcy Court must consider the likelihood and consequences of liquidation for the debtor absent rejection, the reduced value of the creditors' claims that would follow from affirmance and the hardship that would impose on them, and the impact of rejection on the employees. In striking the balance, the Bankruptcy Court must consider not only the degree of hardship faced by each party, but also any qualitative differences between the types of hardship each may face.

The Bankruptcy Court is a court of equity, and in making this determination it is in a very real sense balancing the equities, as the Court of Appeals suggested. Nevertheless, the Bankruptcy Court must focus on the ultimate goal of Chapter 11 when considering these equities. The Bankruptcy Code does not authorize freewheeling consideration of every conceivable equity, but rather only how the equities relate to the success of the reorganization. The Bankruptcy Court's inquiry is of necessity speculative, and it must have great latitude to consider any type of evidence relevant to this issue.

## III

The second issue raised by these cases is whether the NLRB can find a debtor-in-possession guilty of an unfair labor practice for unilaterally rejecting or modifying a collective-bargaining agreement before formal rejection by the Bankruptcy Court. Much effort has been expended

by the parties on the question of whether the debtor is more properly characterized as an "alter ego" or a "successor employer" of the prebankruptcy debtor, as those terms have been used in our labor decisions. See *Howard Johnson Co. v. Hotel Employees, supra,* at 259, n. 5; *NLRB* v. *Burns International Security Services, Inc., supra; Southport Petroleum Co.* v. *NLRB,* 315 U. S. 100, 106 (1942). We see no profit in an exhaustive effort to identify which, if either, of these terms represents the closest analogy to the debtor-in-possession. Obviously if the latter were a wholly "new entity," it would be unnecessary for the Bankruptcy Code to allow it to reject executory contracts, since it would not be bound by such contracts in the first place. For our purposes, it is sensible to view the debtor-in-possession as the same "entity" which existed before the filing of the bankruptcy petition, but empowered by virtue of the Bankruptcy Code to deal with its contracts and property in a manner it could not have employed absent the bankruptcy filing.

The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources. See H. R. Rep. No. 95–595, p. 220 (1977). In some cases reorganization may succeed only if new creditors infuse the ailing firm with additional capital. We recognized the desirability of an analogous infusion of capital in *Burns, supra,* at 288; a similarly beneficial recapitalization could be jeopardized if the debtor-in-possession were saddled automatically with the debtor's prior collective-bargaining agreement. Thus, the authority to reject an executory contract is vital to the basic purpose of a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization.

While all parties to these cases ultimately concede that the Bankruptcy Court may authorize rejection of a collective-bargaining agreement, the Board and the Union nonetheless insist that a debtor-in-possession violates § 8(a)(5) and § 8(d)

of the NLRA if it unilaterally changes the terms of the collective-bargaining agreement between the date of filing the bankruptcy petition and the date on which the Bankruptcy Court authorizes rejection of the agreement.[9] But acceptance of such a contention would largely, if not completely, undermine whatever benefit the debtor-in-possession otherwise obtains by its authority to request rejection of the agreement. In a Chapter 11 reorganization, a debtor-in-possession has until a reorganization plan is confirmed to decide whether to accept or reject an executory contract, although a creditor may request the Bankruptcy Court to make such a determination within a particular time. 11 U. S. C. § 365(d)(2) (1982 ed.). In contrast, during a Chapter 7 liquidation the trustee has only 60 days from the order for relief in which to decide whether to accept or reject an executory contract. § 365(d)(1). It seems to us that this difference between the two types of proceedings reflects the considered judgment of Congress that a debtor-in-possession seeking to reorganize should be granted more latitude in deciding whether to reject a contract than should a trustee in liquidation.

Under the Bankruptcy Code a proof of claim must be presented to the Bankruptcy Court for administration, or be lost when a plan of reorganization is confirmed. See 11 U. S. C. §§ 501, 502, and 1141 (1982 ed.).[10] Actions on claims that

---

[9] The dissent states that the Board's interpretation of the NLRA should be given deference. *Post*, at 542–543. While the Board's interpretation of the NLRA should be given some deference, the proposition that the Board's interpretation of statutes outside its expertise is likewise to be deferred to is novel. We see no need to defer to the Board's interpretation of Congress' intent in passing the Bankruptcy Code.

[10] The Bankruptcy Code's provisions regarding the presentation of claims are permissive. See 11 U. S. C. § 501 (1982 ed.). Nevertheless, the filing of a proof of claim is a necessary condition to the allowance of an unsecured or priority claim, since a plan of reorganization is binding upon all creditors once the plan is confirmed, whether or not the claim was presented for administration. 11 U. S. C. § 1141(d)(1)(A)(i) (1982 ed.). See

have been or could have been brought before the filing of a bankruptcy petition are, with limited exceptions not relevant here, stayed through the automatic stay provisions of the Bankruptcy Code. 11 U. S. C. § 362(a) (1982 ed.). The Bankruptcy Code specifies that the rejection of an executory contract which had not been assumed constitutes a breach of the contract which relates back to the date immediately preceding the filing of a petition in bankruptcy. 11 U. S. C. § 365(g)(1) (1982 ed.).[11] Consequently, claims arising after filing, such as result from the rejection of an executory contract, must also be presented through the normal administration process by which claims are estimated and classified. See 11 U. S. C. § 502(g) (1982 ed.); *In re R. Hoe & Co.*, 508 F. 2d 1126, 1132 (CA2 1974); *Workman* v. *Harrison*, 282 F. 2d 693, 699 (CA10 1960). Thus suit may not be brought against the debtor-in-possession under the collective-bargaining agreement; recovery may be had only through administration of the claim in bankruptcy.[12]

---

*In re Francis*, 15 B. R. 998, 5 C. B. C. 2d 1101 (Bkrtcy. Ct. EDNY 1981); 3 L. King, R. Babitt, A. Herzog, & R. Levin, Collier on Bankruptcy ¶ 501.01 (15th ed. 1983). Undisputed claims listed by the debtor-in-possession under 11 U. S. C. § 521(1) (1982 ed.) are deemed filed for purposes of administration. See 11 U. S. C. § 1111(a) (1982 ed.).

[11] Title 11 U. S. C. § 365(g)(1) (1982 ed.) provides:

"(g) Except as provided in subsections (h)(2) and (i)(2) of this section, the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease—

"(1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, or 13 of this title, immediately before the date of the filing of the petition . . . ."

[12] Section 502(c) provides that any contingent or unliquidated claim shall be estimated for purposes of settling a bankrupt estate. Under this provision losses occasioned by the rejection of a collective-bargaining agreement must be estimated, including unliquidated losses attributable to fringe benefits or security provisions like seniority rights. Section 502(c) is a change from prior law; under § 57d of the Bankruptcy Act the court could disallow unliquidated claims if too difficult to estimate. See 3 Collier on

While the Board insists that § 365(g)(1) deals only with priorities of payment, the implications from the decided cases are that the relation back of contract rejection to the filing of the petition in bankruptcy involves more than just priority of claims.[13] Damages on the contract that result from the rejection of an executory contract, as noted, must be administered through bankruptcy and receive the priority provided general unsecured creditors. See 11 U. S. C. §§ 502(g), 507 (1982 ed.). If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services, *Philadelphia Co.* v. *Dipple*, 312 U. S. 168, 174 (1941), which, depending on the circumstances of a particular contract, may be what is specified in the contract, see *In re Public Ledger*, 161 F. 2d 762, 770–771 (CA3 1947). See also *In re Mammoth Mart, Inc.*, 536 F. 2d 950, 954–955 (CA1 1976). Should the debtor-in-possession elect to assume the executory contract, however, it assumes the contract *cum onere*, *In re Italian Cook Oil Corp.*, 190

Bankruptcy, *supra*, ¶ 502.03. In enacting the Bankruptcy Code Congress also extended the priority for unsecured claims made by workers to cover vacation, severance, sick leave pay, and pension plan obligations and increased the amount of this priority. 11 U. S. C. § 507(a)(3) (1982 ed.); see H. R. Rep. No. 95–595, p. 357 (1977). These provisions indicate Congress' considered judgment regarding the extent to which special provisions should be afforded workers under the Bankruptcy Code for claims arising out of the rejection of the collective-bargaining agreement. In addition, wages paid after the filing of a petition in bankruptcy may be deemed administrative expenses and afforded the highest priority, if necessary to preserve the estate. See 11 U. S. C. § 503(b)(1)(A) (1982 ed.).

[13] See, *e. g.*, *In re Mammoth Mart, Inc.*, 536 F. 2d 950, 954–955 (CA1 1976); *In re Italian Cook Oil Corp.*, 190 F. 2d 994, 996 (CA3 1951); *In re United Cigar Stores Co.*, 89 F. 2d 3, 6 (CA2 1937); *Durand* v. *NLRB*, 296 F. Supp. 1049, 1056 (WD Ark. 1969); *In re Public Ledger*, 161 F. 2d 762, 770–771 (CA3 1947); *In re North Atlantic & Gulf S.S. Co.*, 204 F. Supp. 899, 909 (SDNY 1962), aff'd, 320 F. 2d 628 (CA2 1963); *In re Price Chopper Supermarkets, Inc.*, 19 B. R. 462, 466–467 (Bkrtcy. Ct. SD Cal. 1982).

F. 2d 994, 996 (CA3 1951), and the expenses and liabilities incurred may be treated as administrative expenses, which are afforded the highest priority on the debtor's estate, 11 U. S. C. § 503(b)(1)(A) (1982 ed.).

The necessary result of the foregoing discussion is that the Board is precluded from, in effect, enforcing the terms of the collective-bargaining agreement by filing unfair labor practice charges against the debtor-in-possession for violating § 8(d) of the NLRA. Though the Board's action is nominally one to enforce § 8(d) of that Act, the practical effect of the enforcement action would be to require adherence to the terms of the collective-bargaining agreement. But the filing of the petition in bankruptcy means that the collective-bargaining agreement is no longer immediately enforceable, and may never be enforceable again. Consequently, Board enforcement of a claimed violation of § 8(d) under these circumstances would run directly counter to the express provisions of the Bankruptcy Code and to the Code's overall effort to give a debtor-in-possession some flexibility and breathing space. See H. R. Rep. No. 95–595, p. 340 (1977). We conclude that from the filing of a petition in bankruptcy until formal acceptance, the collective-bargaining agreement is not an enforceable contract within the meaning of NLRA § 8(d). Cf. *Chemical Workers* v. *Pittsburgh Plate Glass Co.*, 404 U. S. 157, 187 (1971); *Charles Dowd Box Co.* v. *Courtney*, 368 U. S. 502, 510–513 (1962).

The Union, but not the Board, also insists that the debtor-in-possession must comply with the midterm contract modification procedures set forth in § 8(d) of the NLRA, 29 U. S. C. § 158(d). See n. 5, *supra*. Because the collective-bargaining agreement is not an enforceable contract within the meaning of § 8(d), it follows that the debtor-in-possession need not comply with the provisions of § 8(d) prior to seeking the Bankruptcy Court's permission to reject the agreement.

Section 8(d) applies when contractual obligations are repudiated by the unilateral actions of a party to the collective-bargaining agreement. We have recognized that Congress'

central purpose in enacting § 8(d) was to regulate the modification of collective-bargaining agreements and to facilitate agreement in place of economic warfare. *Chemical Workers* v. *Pittsburgh Plate Glass Co.*, *supra*, at 187; see also H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 34 (1947). In a Chapter 11 case, however, the "modification" in the agreement has been accomplished not by the employer's unilateral action, but rather by operation of law. Since the filing of a petition in bankruptcy under Chapter 11 makes the contract unenforceable, § 8(d) procedures have no application to the employer's unilateral rejection of an already unenforceable contract. Indeed, even the Board concedes that the cumbersome and rigid procedures of § 8(d) need not be imported into bankruptcy proceedings. Brief for NLRB 41.

The Union maintains, as a fall-back position, that even if § 8(d) procedures do not apply fully, the debtor-in-possession should be required to "bargain to impasse" prior to seeking rejection from the Bankruptcy Court. We interpret this contention to mean that the debtor-in-possession should not be permitted to seek rejection unless the duty to bargain has been excused because further negotiations would be fruitless, a standard little different from that imposed on all employers subject to the NLRA. See *NLRB* v. *American National Insurance Co.*, 343 U. S. 395, 404 (1952); *Taft Broadcasting Co.*, 163 N. L. R. B. 475, 478 (1967), enf'd, 129 U. S. App. D. C. 399, 395 F. 2d 622 (1968). Our rejection of the need for full compliance with § 8(d) procedures of necessity means that any corresponding duty to bargain to impasse under § 8(a)(5) and § 8(d) before seeking rejection must also be subordinated to the exigencies of bankruptcy.[14] Whether

---

[14] Section 8(d) defines the duty to bargain created by § 8(a)(5) to include a duty to continue the terms of a collective-bargaining agreement in "full force" while following § 8(d) procedures for modifying a collective-bargaining agreement. Our determination that § 8(d) cannot be used to enforce the terms of a labor contract after the filing of a petition in bankruptcy and prior to formal rejection necessarily means that § 8(a)(5) cannot be used to achieve the same end. The Court's decision in *NLRB* v. *Katz*,

impasse has been reached generally is a judgment call for the Board to make; imposing such a requirement as a condition precedent to rejection of the labor contract will simply divert the Bankruptcy Court from its customary area of expertise into a field in which it presumably has little or none.

Our determination that a debtor-in-possession does not commit an unfair labor practice by failing to comply with § 8(d) prior to formal rejection of the collective-bargaining agreement does not undermine the policy of the NLRA, for that policy, as we have noted, is to protect the process of labor negotiations, not to impose particular results on the parties. See *H. K. Porter Co.* v. *NLRB*, 397 U. S. 99, 105 (1970); *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 45 (1937). Nevertheless, it is important to note that the debtor-in-possession is not relieved of all obligations under the NLRA simply by filing a petition for bankruptcy. A debtor-in-possession is an "employer" within the terms of the NLRA, 29 U. S. C. §§ 152(1) and (2), and is obligated to bargain collectively with the employees' certified representative over the terms of a new contract pending rejection of the existing contract or following formal approval of rejection by the Bankruptcy Court. See *NLRB* v. *Burns International Security Services, Inc.*, 406 U. S., at 281. But while a debtor-in-possession remains obligated to bargain in good faith under NLRA § 8(a)(5) over the terms and conditions of a possible new contract, it is not guilty of an unfair labor practice by unilaterally breaching a collective-bargaining agreement before formal Bankruptcy Court action.

Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

369 U. S. 736 (1962), that an employer's unilateral modification of terms and conditions of employment during the pendency of negotiations constitutes an unfair labor practice, contrary to the dissent's suggestion, *post*, at 547, n. 15, is not on point, since *Katz* did not address the effect of the bankruptcy laws on an employer's duty to bargain under § 8(a)(5).

JUSTICE BRENNAN, with whom JUSTICE WHITE, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, concurring in part and dissenting in part.

The Court holds that under § 365 of the Bankruptcy Code[1] a Bankruptcy Court should permit a debtor in possession[2] to reject a collective-bargaining agreement upon a showing that the agreement "burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract." *Ante*, at 526. This test properly accommodates the policies of the National Labor Relations Act (NLRA) and the Bankruptcy Code, and I therefore join Parts I and II of the Court's opinion. But I cannot agree with the Court's holding in Part III that a debtor in possession does not commit an unfair labor practice if he unilaterally alters the terms of an existing collective-bargaining agreement after a bankruptcy petition has been filed, but before a Bankruptcy Court has authorized the rejection of that agreement. *Ante*, at 532. In so holding, the Court has completely ignored important policies that underlie the NLRA, as well as Parts I and II of its own opinion.

I

Two sections of the NLRA govern the alteration of existing collective-bargaining agreements. Section 8(a)(5) makes

---

[1] Section 365 provides in pertinent part: "Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U. S. C. § 365(a) (1982 ed.).

[2] Under § 1101 of the Bankruptcy Code, 11 U. S. C. § 1101 (1982 ed.), the debtor in possession is the debtor in any case in which "no person has qualified and is serving as a trustee." 1 A. Herzog & L. King, Bankruptcy Code § 1101, p. 452 (1983). Section 1107 provides that "[s]ubject to . . . such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights . . . and powers" of a reorganization trustee other than the right to compensation. These powers include "the power to operate the debtor's business unless the court orders other-

it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees . . . ."[3]   Section 8(d) defines the § 8(a)(5) duty to "bargain collectively" as "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment."[4]   When a collective-bargaining agreement is "in

---

wise." 5 L. King, C. Cyr, K. Klee, H. Minkel, & W. Taggart, Collier on Bankruptcy ¶ 1101.01, p. 1101–2 (15th ed. 1983).

[3] The complete text of § 8(a)(5) reads as follows:
"It shall be an unfair labor practice for an employer—

.          .          .          .          .

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."   29 U. S. C. § 158(a).

[4] The complete text of the relevant portion of § 8(d) provides:
"For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: *Provided*, That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

"(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

"(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

"(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the

effect," § 8(d) adds four additional requirements to the duty to bargain collectively: "no party to [a collective-bargaining contract] shall terminate or modify such contract unless" he (1) provides the other party to the contract with timely written notice of the proposed modification, (2) "offers to meet and confer with the other party," (3) provides timely notice to the Federal Mediation and Conciliation Service and any similar state agencies, and (4) "continues in full force and effect . . . all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later."[5] Because § 8(d) defines the duty to bargain collectively that is imposed by § 8(a)(5), an employer who terminates or modifies a collective-bargaining agreement without complying with the requirements of § 8(d) violates § 8(a)(5). See *NLRB* v. *Lion Oil Co.*, 352 U. S. 282, 285 (1957) (employer who violates § 8(d)(4) violates § 8(a)(5)).[6] A unilateral modification

---

dispute occurred, provided no agreement has been reached by that time; and

"(4) continues in full force and effect, without resorting to strike or lockout, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later:

"The duties imposed upon employers, employees, and labor organizations by paragraphs (2) to (4) of this subsection . . . shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract. Any employee who engages in a strike within any notice period specified in this subsection, or who engages in any strike within the appropriate period specified in subsection (g) of this section, shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 158, 159, and 160 of this title, but such loss of status for such employee shall terminate if and when he is reemployed by such employer." 29 U. S. C. § 158(d).

[5] See n. 4, *supra*, for the complete text of this portion of § 8(d).

[6] Because § 8(d) begins by defining the collective bargaining as the "obligation . . . to meet . . . and confer . . . with respect to *wages, hours and other terms and conditions of employment*" (emphasis added), we held that

of an existing collective-bargaining agreement is, therefore, a violation of § 8(d) and § 8(a)(5). See *Chemical Workers* v. *Pittsburgh Plate Glass Co.*, 404 U. S. 157, 159, 185 (1971); *Lion Oil, supra,* at 285.

In this litigation, the National Labor Relations Board (Board) held that Bildisco had violated § 8(a)(5) of the NLRA by unilaterally altering the terms of its collective-bargaining agreement with Local 408 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America.[7] Specifically, the Board found that Bildisco violated the terms of that agreement by its failure to (1) increase wages, (2) make pension, health, and welfare contributions, (3) remit dues to the union that were withheld from employees' wages, and (4) pay vacation benefits. Some of these activities occurred after Bildisco filed a voluntary petition in bankruptcy under Chapter 11 of the Bankruptcy Code, 11 U. S. C. § 1101 *et seq.* (1982 ed.), but before the Bankruptcy Court authorized Bildisco to reject its agreement with Local 408. During this period, Bildisco was operating its business as a debtor in possession. This aspect of the cases, therefore, presents the question whether a debtor in possession violates § 8(d) and, as a result, § 8(a)(5) if he unilaterally modifies the terms of a collective-bargaining agreement in the interim between the filing of a bankruptcy petition and the rejection of that agreement.

## II

The Court today rejects the Board's finding that Bildisco's unilateral modifications of its collective-bargaining agree-

---

notice and waiting period requirements of § 8(d) are applicable to a modification only when it "changes a term that is a mandatory rather than a permissive subject of bargaining." *Chemical Workers* v. *Pittsburgh Plate Glass Co.*, 404 U. S. 157, 185 (1971).

[7] The Board also held that Bildisco had violated § 8(a)(1). However, because this holding is wholly dependent on the § 8(a)(5) violation, it presents no independent issues. See *Chemical Workers, supra,* at 163, n. 6. See generally R. Gorman, Basic Text on Labor Law 132 (1976) (conduct that violated § 8(5) also violated § 8(1) derivatively).

ment violated § 8(a)(5). The Court supports this conclusion by asserting that enforcement of § 8(d) in the postfiling period "would run directly counter to the express provisions of the Bankruptcy Code." *Ante,* at 532. Yet, the Court points to no provision of that Code that purports to render § 8(d) inapplicable, and to no provision of the NLRA that would preclude the application of § 8(d). Indeed, the Court concedes that a debtor in possession generally must comply with the provisions of the NLRA. *Ante,* at 534.

Accordingly, in order to achieve its desired result, the Court is forced to infer from the Bankruptcy Code's general treatment of executory contracts, and from the policies that underlie that treatment, that Congress must have intended the filing of a bankruptcy petition to render § 8(d) inapplicable. *Ante,* at 529–532. The Court observes that during the postpetition period, the nondebtor party to an executory contract may not sue the debtor in possession to enforce the contract terms, *ante,* at 530, but rather can only recover the reasonable value of any benefits conferred on the estate. *Ante,* at 531.[8] By contrast, "[t]hough the Board's action is

---

[8] The Court appears to attribute the rule that the debtor in possession is liable only for the reasonable value of benefits conferred, and not for the debtor's obligations under the contract, to 11 U. S. C. § 365(g)(1) (1982 ed.). Section 365(g)(1) does not, however, serve that function.

In pertinent part, § 365(g)(1) provides that "the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease . . . if such lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, or 13 of this title, immediately before the date of the filing of the petition." None of the cases relied upon by the Court, however, refer to § 365(g)(1) or its predecessor under the Bankruptcy Act as the source of the limitation of the estate's liability to the reasonable value of benefits conferred. In only one case, *In re North Atlantic & Gulf S.S. Co.,* 204 F. Supp. 899, 909 (SDNY 1962), aff'd, 320 F. 2d 628 (CA2 1963), does the court even arguably relate the principles of retroactivity to the unenforceability of contracts in the interim period. Moreover, the legislative history of § 365(g)(1) makes it clear that the purpose of that provision is to insure that claims stemming from rejection are treated as general unsecured claims. The House and Senate Reports explain that

nominally one to enforce § 8(d) . . . the practical effect of the enforcement action would be to require adherence to the terms of the collective-bargaining agreement." *Ante,* at 532. Because the Court finds that suspending the enforceability of executory contracts serves the goals of providing the debtor in possession with "flexibility and breathing space," the Court concludes that Congress could not have intended § 8(d) to remain applicable once a bankruptcy petition has been filed.

This argument is unpersuasive. However correct the Court may be in its description of the manner in which the Bankruptcy Code treats executory contracts generally and the policies that underlie that treatment, there is an unavoid-

---

"[t]he purpose [of § 365(g)(1)] is to treat rejection claims as prepetition claims." S. Rep. No. 95–989, p. 60 (1978); H. R. Rep. No. 95–595, p. 349 (1977). See also 2 L. King, K. Klee, R. Levin, H. Miller, & P. Murphy, Collier on Bankruptcy ¶ 365.08, p. 365–41 (15th ed. 1983). The extent to which the claim arising from rejection will be allowed is therefore determined by the rules for the allowance of prepetition claims. See 11 U. S. C. § 502(g) (1982 ed.); 3 L. King, R. Babitt, A. Herzog, & R. Levin, Collier on Bankruptcy ¶ 502.08, p. 502–100 (15th ed. 1983). In addition, the priority, if any, to be accorded such a claim will be determined according to the rules for prepetition claims. 11 U. S. C. § 507 (1982 ed.). Were damages stemming from rejection treated as postpetition, rather than prepetition, claims, they would be accorded first priority as administrative expenses. Bordewieck & Countryman, The Rejection of Collective Bargaining Agreements by Chapter 11 Debtors, 57 Am. Bankr. L. J. 293, 331 (1983); 2 Collier on Bankruptcy, *supra,* ¶ 365.08, at 365–41.

Although the statutory basis for the rule that the debtor in possession is not liable for the debtor's obligations under the contract until it is assumed is not entirely clear, the leading treatise appears to attribute the rule to the concept that title to an executory contract does not pass to the estate until the contract is assumed. *Id.,* ¶ 365.03, at 365–24. See also Bordewieck & Countryman, *supra,* at 303. The debtor in possession's liability for the reasonable value of any benefits conferred stems from § 503(b), which allows administrative expenses for the "actual, necessary costs and expenses of preserving the estate." 3 Collier on Bankruptcy, *supra,* ¶ 503.04, at 503–15.

able conflict between the Code and the NLRA with which the Court has simply failed to grapple. Permitting a debtor in possession unilaterally to alter a collective-bargaining agreement in order to further the goals of the Bankruptcy Code seriously undermines the goals of the NLRA. We thus have the duty to decide the issue before us in a way that accommodates the policies of *both* federal statutes. That cannot properly be done, in the Court's fashion, by concentrating on the Bankruptcy Code alone; under that approach, a holding that § 8(d) is inapplicable once a bankruptcy petition has been filed must obviously follow. One could as easily, and with as little justification, focus on the policies and provisions of the NLRA alone and conclude that Congress must have intended that § 8(d) remain applicable. Rather, it is necessary to examine the policies and provisions of both statutes to answer the question presented to the Court.

The Court's concentration on the Bankruptcy Code and its refusal to accommodate that statute with the NLRA is particularly incongruous since the analysis in Part II of its opinion rests almost exclusively on the recognition that the two statutes must be accommodated. In that Part, the Court concludes that "because of the special nature of a collective-bargaining contract . . . a somewhat stricter standard should govern the decision of the Bankruptcy Court to allow rejection of a collective-bargaining agreement." *Ante*, at 524. Surely, the "special nature of a collective-bargaining contract" must also be considered when determining whether Congress intended a debtor in possession to be able unilaterally to alter its terms. I can only conclude that the Court does not do so because an examination of the policies and provisions of both statutes inexorably leads to the conclusion that Congress did not intend the filing of a bankruptcy petition to affect the applicability of § 8(d), and that, as a result, a debtor in possession commits an unfair labor practice when he unilaterally alters the terms of an existing collective-

bargaining agreement after a bankruptcy petition has been filed but prior to rejection of that agreement.[9]

### III

### A

Because the issue in this litigation centers on the effect of filing a bankruptcy petition on the obligations of a debtor in possession under NLRA § 8(d), it is appropriate to begin by examining whether that provision would apply even in the absence of the countervailing provisions and policies of the Bankruptcy Code. In undertaking this threshold analysis, we must remember that we have previously recognized that § 8(d) must be construed flexibly to effectuate the purposes of the NLRA. See, *e. g.*, *NLRB* v. *Lion Oil Co.*, 352 U. S., at 290; *Mastro Plastics Corp.* v. *NLRB*, 350 U. S. 270 (1956). As we stated in *Lion Oil*, a construction that does not serve the goals of the statute "is to be avoided unless the words Congress has chosen clearly compel it." 352 U. S., at 289.

In addition, in resolving this threshold question we must be mindful of the deference to the Board's construction of the NLRA required by our decisions. See, *e. g.*, *NLRB* v. *Iron*

---

[9] Despite this conclusion, I agree with the Court that the debtor in possession need not comply with the notice requirements and waiting periods imposed by § 8(d) before seeking rejection. That is, in order to obtain rejection, the debtor in possession need not, for example, demonstrate that he has given notice to the union of his desire to seek rejection and has maintained the contract in "full force and effect" without resorting to a lockout for the period required by § 8(d). I also agree that the debtor in possession need not bargain to impasse before he may seek the court's permission to reject the agreement. As the Board notes, debtors in possession may need expeditious determinations about whether they may reject a collective-bargaining agreement. The notice and waiting periods contained in § 8(d) would make a rapid determination impossible. Brief for NLRB 41. Nor, as the Court notes, should the Bankruptcy Court be required to make determinations that are wholly outside its area of expertise, such as whether the parties have bargained to impasse. *Ante*, at 526–527, 533–534. Rather, I believe that the test for determining whether rejection should be permitted enunciated in Part II of the Court's opinion strikes the proper balance between the NLRA and the Bankruptcy Code.

*Workers*, 434 U. S. 335, 350 (1978); *NLRB* v. *J. Weingarten, Inc.*, 420 U. S. 251, 267 (1975); *NLRB* v. *Erie Resistor Corp.*, 373 U. S. 221, 236 (1963). It is the Board's position that filing a bankruptcy petition does not affect the applicability of § 8(d).[10] See, *e. g.*, *ISG Extrusion Toolings, Inc.*, 262 N. L. R. B. 114 (1982) (debtor in possession violates § 8(d) by unilaterally altering terms of collective-bargaining agreement); *Airport Limousine Service, Inc.*, 231 N. L. R. B. 932 (1977) (receiver violates § 8(d)). Plainly, the Court's position that § 8(d) is inapplicable once a bankruptcy petition has been filed is contrary to the goals of the NLRA, and a careful examination of "the words Congress has chosen" reveals that they do not "clearly compel" this result.

By their terms, the notice and cooling-off requirements of § 8(d) apply when "there is in effect a collective-bargaining contract" and a "party to such contract" seeks to "terminate or modify" it. The Court of Appeals held that § 8(d) was inapplicable because the "debtor-in-possession is '[a] new entity . . . created with its own rights and duties, subject to the supervision of the bankruptcy court.'" *In re Bildisco*, 682 F. 2d 72, 82 (CA3 1982), quoting *Shopmen's Local Union No. 455* v. *Kevin Steel Products, Inc.*, 519 F. 2d 698, 704 (CA2 1975). As a result, the Court of Appeals concluded that the debtor in possession is not a "party" to a collective-bargaining agreement within the meaning of § 8(d).[11]

---

[10] The Board has held that a trustee was not bound by a pre-existing collective-bargaining agreement when there were drastic changes in the operations of the debtor company immediately after the bankruptcy petition was filed. *Blazer Industries, Inc.*, 236 N. L. R. B. 103, 109–110 (1978). Because these cases involve a debtor in possession, rather than a trustee, and because there is nothing in the opinion of the Court of Appeals for the Third Circuit or the Board suggesting that drastic changes of the significance found in *Blazer* took place in Bildisco's operation, *Blazer* is simply not relevant to the issues before us today.

[11] In concluding that a debtor in possession does not commit an unfair labor practice if he unilaterally alters the terms of the collective-bargaining agreement, the Court of Appeals also relied on an analogy to the doctrine

544

The Court today properly rejects the "new entity" theory, conceding that the debtor in possession is a party within the meaning of § 8(d). *Ante,* at 528. The Court nevertheless reaches an equally unsupportable result by concluding that once a bankruptcy petition has been filed, "the collective-

of successorship, as applied by this Court in *NLRB* v. *Burns International Security Services, Inc.,* 406 U. S. 272 (1972). In my view, this reliance was misplaced.

In *Burns,* we considered the bargaining obligations of a "successor" employer. The respondent in *Burns,* Burns International Security Services, Inc., won a contract to provide security services that had been provided by Wackenhut Corp. A majority of the individuals hired by Burns were former Wackenhut employees. We held that Burns was not bound by the terms of the collective-bargaining agreement between Wackenhut and its employees, but that Burns had a duty to bargain with the union that had represented those employees. Our conclusion that Burns was not bound by Wackenhut's collective-bargaining agreement was based largely on the ground that Congress did not intend to bind an employer to terms to which it had not agreed. This consideration has little relevance to this litigation because the debtor in possession is the same employer who agreed to the collective-bargaining agreement. We also noted in *Burns* that a potential employer might be reluctant to take over a failing business if he were bound by his predecessor's labor contract. Given that the debtor is bound by the collective-bargaining agreement before he files his bankruptcy petition, holding that he remains bound after the petition is filed cannot act as a disincentive to filing the petition.

The Court of Appeals also found § 8(d) inapplicable because rejection relates back to the time immediately before the filing under § 365(g)(1). As a result, that court concluded that "no labor contract effectively existed between the union and the debtor-in-possession" after the petition was filed. 682 F. 2d, at 84. As noted above, however, see n. 8, *supra,* § 365(g)(1) is merely intended to insure that claims for damages stemming from the rejection of a collective-bargaining agreement are treated as prepetition unsecured claims. Although the fiction of relation back under § 365(g)(1) serves a useful function under the Bankruptcy Code, extending this fiction to the NLRA is not helpful in finding the proper accommodation between those two statutes. As should be apparent from the discussion in the text, see *infra,* at 545–546, for purposes of § 8(d), it is inaccurate to suggest that the collective-bargaining agreement does not exist after the bankruptcy petition is filed.

bargaining agreement is not an enforceable contract within the meaning of NLRA § 8(d)." *Ante*, at 532. Of course, the phrase "enforceable contract" does not appear in § 8(d), so the Court's point must be that the collective-bargaining agreement is not "in effect" within the meaning of that section. Surely, the plain language of the statute does not compel this result. Perhaps the Court's omission of any specific reference to this phrase indicates that it agrees that the language is not dispositive. In any event, it is simply incorrect to suggest that the collective-bargaining agreement does not retain sufficient vitality after a bankruptcy petition has been filed to be reasonably termed "in effect" within the meaning of the statute.

Although enforcement of the contract is suspended during the interim period, the contract clearly has other characteristics that render it "in effect" during the interim period. For example, if the debtor in possession assumes the contract, that assumption relates back to the time that the bankruptcy petition was filed. 2 L. King, K. Klee, R. Levin, H. Miller, & P. Murphy, Collier on Bankruptcy ¶ 365.03, p. 365–24 (15th ed. 1983). As a result, "[a]ny compensation earned by and payable to the employee under the contract" after the petition is filed is a first priority administrative expense. Countryman, Executory Contracts in Bankruptcy: Part II, 58 Minn. L. Rev. 479, 484 (1974). See also Fogel, Executory Contracts and Unexpired Leases in The Bankruptcy Code, 64 Minn. L. Rev. 341, 376 (1980). If the contract is eventually rejected, rejection constitutes a breach effective immediately before the date of the filing of the petition. 11 U. S. C. § 365(g) (1982 ed.). The employees will have general unsecured claims for damages resulting from that breach. 3 L. King, R. Babitt, A. Herzog, & R. Levin, Collier on Bankruptcy, ¶ 502.07, p. 502–99 (15th ed. 1983); Note, The Bankruptcy Law's Effect on Collective Bargaining Agreements, 81 Colum. L. Rev. 391 (1981). Some

of these damages will stem from the employer's obligations under the contract in the postfiling period. Therefore, whether the contract is accepted or rejected, it will support a claim that arises out of the debtor's obligations in the post-petition period.[12]

Additionally, even under the Court's approach, see *ante*, at 531, during the interim between filing and rejection or assumption, the estate will be liable to the employees for the reasonable value of any services they perform. The contract rate frequently will be the measure of the reasonable value of those services. See, *e. g., In re Chase Commissary,* 11 F. Supp. 288 (SDNY 1935) (rental in lease presumed to be reasonable value of use and occupancy); Fogel, *supra,* at 370 (generally courts presume lease rentals reasonable). For these reasons, it is inaccurate to say that the collective-bargaining agreement may not reasonably be considered "in effect" for purposes of NLRA § 8(d).[13] Other provisions of the NLRA, as well as the policies underlying that statute, require that such a contract be considered "in effect."[14]

---

[12] In the unlikely event that the contract is neither accepted nor rejected, it will "ride through" the bankruptcy proceeding and be binding on the debtor even after a discharge is granted. *Federal's, Inc.* v. *Edmonton Investment Co.,* 555 F. 2d 577, 579 (CA6 1977); 2 Collier on Bankruptcy, ¶ 365.03, p. 365–22. The nondebtor party's claim will therefore survive the bankruptcy proceeding. Countryman, Executory Contracts in Bankruptcy: Part II, 58 Minn. L. Rev. 479, 487 (1974).

[13] It is noteworthy that courts considering bankruptcy cases often refer to executory contracts as remaining "in effect" unless or until they are rejected. See, *e. g., Federal's, Inc.* v. *Edmonton Investment Co., supra,* at 579 (executory contracts "remain in effect unless" rejected during the proceedings); *Consolidated Gas Electric Light & Power Co.* v. *United Railways Co.,* 85 F. 2d 799, 805 (CA4 1936) (executory contract "remains in force . . . until it is rejected"); *Smith* v. *Hill,* 317 F. 2d 539, 542, n. 6 (CA9 1963) (executory contracts "continu[e] in effect" unless rejected); *In re Guardian Equipment Corp.,* 18 B. R. 864, 867 (Bkrtcy. Ct. SD Fla. 1982) (lease that has not been assumed or rejected "remains in effect").

[14] Even if we could say that the collective-bargaining agreement is not "in effect" and that the notice and waiting period requirements of § 8(d) are inapplicable, it does not necessarily follow that the debtor in possession

The definitional sections of the NLRA plainly support the conclusion that Congress did not intend the filing of a bankruptcy petition to affect the applicability of § 8(d). As the Court notes, a debtor in possession is an "employer" within the meaning of the NLRA. *Ante*, at 534.[15] Because § 8(a)(5) imposes the duty to bargain on employers, the Court properly concludes that § 8(a)(5) applies to debtors in possession. *Ibid.* And because the definition of the duty to bargain includes the notice and "cooling-off" requirements of § 8(d), *Lion Oil*, 352 U. S., at 285, the logical inference is that Congress intended these restrictions of unilateral alterations to apply to debtors in possession as well. It is most unlikely that Congress intended that the obligation to bargain apply to debtors in possession but not the definition of that duty.

## B

The policies underlying the NLRA in general, and § 8(d) in particular, also strongly support the application of the notice and cooling-off requirements of § 8(d) in this context. As we explained in *First National Maintenance Corp.* v. *NLRB*,

---

may unilaterally alter terms and conditions of employment. For example, in *NLRB* v. *Katz*, 369 U. S. 736, 743 (1962), although the parties had not yet concluded their negotiations for an initial collective-bargaining agreement, we held that "an employer's unilateral change in conditions of employment under negotiation is . . . a violation of § 8(a)(5), for it is a circumvention of the duty to negotiate which frustrates the objectives of § 8(a)(5) much as does a flat refusal [to negotiate]." In addition, it has been widely held that an employer generally may not make unilateral changes in matters that are mandatory subjects of bargaining even after a collective-bargaining agreement has expired. See, *e. g., Peerless Roofing Co.* v. *NLRB*, 641 F. 2d 734, 735 (CA9 1981); *Clear Pine Mouldings, Inc.* v. *NLRB*, 632 F. 2d 721, 729 (CA9 1980); *Hinson* v. *NLRB*, 428 F. 2d 133, 136 (CA8 1970).

[15] Section 2(2), 29 U. S. C. § 152(2), defines the term "employer" to include "any person acting as an agent of an employer, directly or indirectly." A trustee or a debtor in possession is a "person" within the meaning of § 2(2) as § 2(1) of the NLRA, 29 U. S. C. § 152(1), defines "person" to include "trustees in cases under Title 11 [which governs bankruptcy], or receivers."

452 U. S. 666 (1981): "A fundamental aim of the National Labor Relations Act is the establishment and maintenance of industrial peace to preserve the flow of interstate commerce. Central to achievement of this purpose is the promotion of collective bargaining as a method of defusing and chaneling conflict between labor and management." *Id.*, at 674 (citation omitted). See also NLRA § 1, 29 U. S. C. § 151. Because of the central role played by collective bargaining in achieving the goals of the NLRA, "[e]nforcement of the obligation to bargain collectively is crucial to the statutory scheme." *NLRB* v. *American National Insurance Co.*, 343 U. S. 395, 402 (1952). The notice and cooling-off requirements of § 8(d), which are components of the duty to bargain, are specifically designed to prevent labor strife resulting from unilateral modifications and terminations of collective-bargaining agreements. In *Chemical Workers* v. *Pittsburgh Plate Glass Co.*, 404 U. S. 157 (1971), we explained: "The purpose of the proscription of unilateral mid-term modifications and terminations in 8(d) cannot be, therefore, simply to assure adherence to contract terms. . . . The conditions for a modification or termination set out in paragraphs (1) through (4) plainly are designed to regulate modifications and terminations so as to facilitate agreement in place of economic warfare. . . . [T]he provision 'seeks to bring about the termination and modification of collective-bargaining agreements without interrupting the flow of commerce or the production of goods.'" *Id.*, at 187, quoting *Mastro Plastics*, 350 U. S., at 284.

Plainly, the need to prevent "economic warfare" resulting from unilateral changes in terms and conditions of employment is as great after a bankruptcy petition has been filed as it is prior to that time. I do not think that there is any question that the threat to labor peace stemming from a unilateral modification of a collective-bargaining agreement is as great one day after a bankruptcy petition is filed as it was one day

before the petition was filed.[16] We cannot ignore these realities when construing the reach of the NLRA. Cf. *NLRB* v. *Erie Resistor Corp.*, 373 U. S., at 236 (citing Board's function in applying the "general provisions of the Act to the complexities of industrial life" as a reason to defer to its judgment). Nor can we ignore the judgment of the Board that § 8(d) should remain applicable after a bankruptcy petition has been filed, because that judgment stems from the Board's "special understanding of 'the actualities of industrial relations,'" *ibid.*, quoting *NLRB* v. *Steelworkers*, 357 U. S. 357, 362–363 (1958).

The basis for § 8(d)'s prohibition against unilateral modifications is a congressional judgment that such modifications would be antithetical to labor peace. As we explained in a somewhat different context in *Fibreboard Paper Products Corp.* v. *NLRB*, 379 U. S. 203, 211 (1964), "[t]he Act was framed with an awareness that refusals to confer and negotiate had been one of the most prolific causes of industrial strife." Permitting unilateral modifications of collective-bargaining agreements, therefore, seriously undermines policies that lie at the very heart of § 8(d) and the NLRA. In sum, were one to consider only the policies and provisions of the NLRA, there could be no question that Congress intended that § 8(d) remain applicable after a bankruptcy petition has been filed.

---

[16] Recent events make it clear that the fear of labor unrest resulting from postfiling unilateral modifications is not merely a hypothetical possibility. For example, on September 24, 1983, Continental Airlines filed a Chapter 11 petition. The company immediately instituted wage reductions that ranged from 45 to 50%. N. Y. Times, Sept. 28, 1983, p. D6. On October 3, Continental's pilots and flight attendants went on strike. N. Y. Times, Oct. 3, 1983, p. B13. Similarly, on April 22, 1983, Wilson Foods Corp. filed a Chapter 11 petition. Three days later, the company reduced wages by 40 to 50%. N. Y. Times, May 3, 1983, p. D2. The wage cut prompted a strike in early June. N. Y. Times, June 11, 1983, p. 31.

## C

When we turn to the relevant provisions and policies of the Bankruptcy Code, we find nothing that alters this conclusion. As I have said, *supra*, at 539, the Court is unable to point to any provision of the Bankruptcy Code that by its terms renders § 8(d) inapplicable. Nor does the Court argue that there is anything in the Code that would forbid the debtor in possession to comply with the requirements of § 8(d).[17] The question then is whether application of § 8(d) would so undermine the goals of the Bankruptcy Code that, despite the deleterious effect on the policies of the NLRA, Congress could not have intended that § 8(d) remain applicable once a bankruptcy petition has been filed.

As the Court correctly points out, the primary goal of Chapter 11 is to enable a debtor to restructure his business so as to be able to continue operating. *Ante*, at 528. Unquestionably, the option to reject an executory contract is essential to this goal. But the option to violate a collective-bargaining agreement before it is rejected is scarcely vital to insuring successful reorganization. For if a contract is so

---

[17] The Court does suggest that § 502(c), which provides for the estimation of contingent and unliquidated claims, and § 507(a)(3), which grants third-priority status to certain claims for compensation earned prior to the filing of the petition, "indicate Congress' considered judgment regarding the extent to which special provisions should be afforded workers under the Bankruptcy Code." *Ante*, at 531, n. 12. If, as I conclude, Congress intended § 8(d) to remain applicable after a bankruptcy petition is filed, it would, however, have been unnecessary to repeat the protections contained by that section in the Bankruptcy Code.

In addition, the Court refers to, and appears to find significance in, the automatic stay provision, 11 U. S. C. § 362(a) (1982 ed.), and the requirement that damages stemming from rejection of an executory contract be recovered through the Code's claims administration procedures. *Ante*, at 529–530. However, since the Court does not argue that the automatic stay provision would bar an NLRB proceeding to enforce § 8(d) or that any award in such proceedings would not be recovered through the bankruptcy claims administration procedures, I fail to see why the Court finds these sections relevant to our resolution of the issue before us.

burdensome that even temporary adherence will seriously jeopardize the reorganization, the debtor in possession may seek the Bankruptcy Court's permission to reject that contract. Under the test announced by the Court today, his request should be granted.[18] Indeed, because labor unrest is inimical to the prospects for a successful reorganization, and because unilateral modifications of a collective-bargaining agreement will often lead to labor strife, such unilateral modifications may more likely *decrease* the prospects for a successful reorganization.

The Court claims that requiring the debtor in possession to adhere to the terms of a collective-bargaining agreement conflicts with the "Code's overall effort to give a debtor-in-possession some flexibility and breathing space." *Ante*, at 532. Again the Court does not explain how enforcement of §8(d) interferes with these policies; but I assume that the Court expects that the financial pressures created by requiring adherence to the collective-bargaining agreement would put pressure on the debtor in possession to reach a rapid and possibly premature judgment about whether to assume or reject a contract.[19] It is apparent, however, that Congress did not believe that providing the debtor in possession with unlimited time to consider his options should outweigh all other

---

[18] I therefore fundamentally disagree with the Court's wholly unsupported statement that application of §8(d) "would largely, if not completely, undermine whatever benefit the debtor-in-possession otherwise obtains by its authority to request rejection of the agreement." *Ante*, at 529.

[19] This financial pressure is created primarily by the fact that the cost of the debtor in possession's compliance with §8(d) would be accorded first priority as an administrative expense. See *In re Bel Air Chateau Hospital, Inc.*, 106 LRRM 2834 (CD Cal. 1980) (Board award for backpay accruing during reorganization given first priority as a cost of administration); Bordewieck & Countryman, 57 Am. Bankr. L. J., at 333. Cf. *Reading Co. v. Brown*, 391 U. S. 471 (1968) (damages resulting from negligence of receiver administering an estate under Chapter XI of the Bankruptcy Act afforded first priority as an administrative expense).

considerations. For example, although Chapter 11 permits a debtor in possession to accept or reject a contract "at any time before the confirmation of a plan," the nondebtor party to such a contract is permitted to request that the court order the debtor in possession to assume or reject the contract within a specified period. 11 U. S. C. § 365(d)(2) (1982 ed.). Congress thus clearly concluded that, in certain circumstances, the rights of the nondebtor party would outweigh the need of the debtor in possession for unlimited flexibility and breathing space.

More importantly, I do not believe that the pressure to seek early rejection will frequently impede the reorganization process. As noted above, when a collective-bargaining agreement will seriously impede the reorganization, the debtor in possession should be able to obtain permission to reject the agreement. The major danger to the reorganization that stems from premature rejection of collective-bargaining agreements is that the debtor in possession will reject an agreement he would not have rejected upon further deliberation. If that agreement contains terms more favorable than any that he is later able to obtain through renegotiation the reorganization may be impaired. In the case of a collective-bargaining agreement, however, this danger is largely illusory. Because the union members will lose their jobs if the reorganization fails, it is highly likely that the debtor in possession will be able to negotiate a contract that is at least as favorable as the contract that he has rejected. Cf. *First National Maintenance Corp.* v. *NLRB*, 452 U. S., at 681, n. 19 (noting instances in which unions have aided employers to save failing businesses); N. Y. Times, Oct. 9, 1983, section 3, pp. 1, 12 (reporting instances of employees agreeing to wage reductions in response to threatened bankruptcy or plant closings). In addition, because unions have a strong incentive to avoid rejection of contracts, they frequently may be willing to enter into negotiated settlements for the interim period that will at least forestall rejection. Consequently, in

many cases, requiring the debtor in possession to adhere to the terms of an existing agreement will not lead to early rejection at all. In sum, because the debtor in possession may apply to the bankruptcy court for rejection of executory contracts, holding § 8(d) applicable to the reorganization period will not seriously undermine the chances for a successful reorganization.

## IV

My conclusion that Congress intended that a debtor in possession adhere to the terms of a collective-bargaining agreement in the postpetition period, when he is free to disregard all other contracts, is supported by our consistent recognition that collective-bargaining agreements are not like other agreements. What Justice Douglas wrote in 1960 remains true today:

"The collective bargaining agreement . . . is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. . . .

"A collective bargaining agreement is an effort to erect a system of industrial self-government. When most parties enter into contractual relationship, they do so voluntarily, in the sense that there is no real compulsion to deal with one another, as opposed to dealing with other parties. This is not true of the labor agreement. The choice is generally not between entering or refusing to enter into a relationship, for that in all probability preexists the negotiations. Rather, it is between having that relationship governed by an agreed-upon rule of law or leaving each and every matter subject to a temporary resolution dependent solely upon the relative strength, at any given moment, of the contending forces." *Steelworkers* v. *Warrior & Gulf Navigation Co.*, 363 U. S. 574, 578–580 (citations and footnotes omitted).

See also *John Wiley & Sons, Inc.* v. *Livingston*, 376 U. S. 543, 550 (1964).

The Court's holding that an employer, without committing an unfair labor practice, may disregard the terms of a collective-bargaining agreement after a bankruptcy petition has been filed deprives the parties to the agreement of their "system of industrial self-government." Without this system, resolution of the parties' disputes will indeed be left to "the relative strength . . . of the contending forces." *Steelworkers, supra,* at 580. Of course, there is some tension between the policies underlying the Bankruptcy Code and a holding that § 8(d) remains applicable after a bankruptcy petition has been filed. Holding § 8(d) inapplicable in these circumstances, however, strikes at the very heart of the policies underlying that section and the NLRA, and will, I believe, spawn precisely the type of industrial strife that § 8(d) was designed to avoid. By contrast, I do not think that the prospects for a successful reorganization will be seriously impaired by holding that § 8(d) continues to apply. For this reason, I conclude that filing a bankruptcy petition does not affect the applicability of § 8(d), and that, as a result, a debtor in possession who unilaterally alters the terms of a collective-bargaining agreement commits an unfair labor practice.